Linda
BROUSARD–NORCROSS, Appellant,

v.

The AUGUSTANA COLLEGE ASSOCIA-
TION, a Corporation; Lloyd Svendsby,
as President of Augustana College; Jim
Meader; Arlen Viste; John Sorenson;
Murray Haar; Gary Olson; Mary
Brendtro; Lamoyne Pederson; as
Members of the Augustana College Per-
sonnel Council; Gary D. Olson, Indi-
vidually and as Vice–President for Aca-
demic Services for Augustana College;
Larry Brendtro, Individually and as
Chairman of the Education Depart-
ment of Augustana College, Appellees.

No. 90–5308.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 11, 1991.

Decided June 14, 1991.

Rehearing and Rehearing En Banc
Denied Aug. 9, 1991.

Rita D. Haverly, Sioux Falls, S.D., for appellant.

Michel L. Luce, Sioux Falls, S.D., for appellees.

Before FAGG and BOWMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.

BOWMAN, Circuit Judge.

Linda Brousard–Norcross appeals from the order of the District Court[1] granting the defendants' motion for summary judgment and dismissing her employment discrimination claims. We affirm.

I.

Linda Brousard–Norcross was a faculty member of the Education Department at Augustana College from 1982 to 1989. At the time of her tenure application in 1987, she was employed as an Assistant Professor. Her tenure review, undertaken by Augustana's Faculty Personnel Council, commenced in the fall of 1987 and concluded in early 1988 with the Council's recommendation to Augustana's Board of Re-

gents that Brousard–Norcross be denied tenure. Brousard–Norcross was informed of this decision in January 1988. She subsequently filed a complaint with the South Dakota Division of Human Rights and the Equal Employment Opportunity Commission. She then filed this action, claiming her tenure denial constituted unlawful sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (1988), and unlawful handicap discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1988). She also filed a claim under the Equal Pay Act of 1963, 29 U.S.C. § 206 (1988), along with various pendent state law claims. The District Court granted the defendants' motions for summary judgment with respect to the Title VII claim, the Rehabilitation Act claim, and the Equal Pay Act claim. The District Court also dismissed without prejudice Brousard–Norcross's pendent state law claims. On appeal, Brousard–Norcross asserts there are genuine issues of material fact with respect to her claims and that summary judgment therefore was not appropriate.

II.

As set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), a Title VII plaintiff initially must establish a prima facie case of discrimination. The burden of production then shifts to the defendant to show a legitimate, nondiscriminatory reason for the employment action. The plaintiff then must show that this proffered reason was merely a pretext for unlawful discrimination. At all times, the burden of proof remains with the plaintiff. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981).[2]

Our review of a tenure decision is approached with trepidation; a grant of

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. Brousard–Norcross asserts on appeal, apparently for the first time, that the burden of persuasion should be assigned in a different man-

ner. We decline to address this issue because it was not raised at the District Court level. Accordingly, we use the three-part *McDonnell Douglas* analysis used by the District Court.

tenure is a significant decision for a college and one that is not made lightly.[3] We do not profess to possess the expertise required to evaluate such decisions for their merit. While Title VII unquestionably applies to tenure decisions, judicial review of such decisions is limited to whether the tenure decision was based on a prohibited factor.

Summary judgment is to be granted only when there is no genuine issue as to any material fact. Thus, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), summary judgment is not appropriate. When the defendant moves for summary judgment, "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Id.* at 257, 106 S.Ct. at 2509. This affirmative evidence must be something more than the pleadings; there must be specific facts showing a genuine issue for trial. *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

■ The District Court assumed that Brousard–Norcross had established a prima facie case of sex discrimination. The defendants supported their motion for summary judgment with evidence that her tenure denial was based upon negative student evaluations and negative recommendations from some of her Education Department colleagues. The District Court ruled that Brousard–Norcross failed to establish a factual dispute as to whether these reasons for her tenure denial were pretextual. We agree with the District Court.

### A.

Brousard–Norcross claims that the first reason given for her tenure denial, nega-

tive student evaluations, is a pretext for unlawful sex discrimination because most of her student evaluations were very favorable and a draft of the Personnel Council's letter to Brousard–Norcross informing her of its negative recommendation was changed before being sent. She further claims that an additional "special" survey of her students done in late 1987 is evidence of unlawful sex discrimination. We will accept as true for our purposes that student evaluations of Brousard–Norcross done before 1987 were very favorable; we will also accept as true that a significant number of the student evaluations done in late 1987 praised Brousard–Norcross. But it is also true that many of those student evaluations were highly critical of Brousard–Norcross, and she neither alleges nor provides any evidence that the student evaluation forms, or the comments on them, are gender-biased in any way. It is not for us to determine what constitutes a sufficient amount of negative feedback from students before a denial of tenure is justified; we will not sit as a "super personnel council" to review tenure decisions. Suffice it to say that student reaction is a legitimate, nondiscriminatory factor on which to evaluate tenure candidates.

That an additional survey of students was conducted in late 1987 does not call into doubt the College's proffered reasons for the denial of tenure. The policy of the Personnel Council at the time of Brousard–Norcross's tenure application was to consider the student evaluations from the spring preceding the fall in which the tenure application was made. According to the Vice–President for Academic Services, defendant Gary Olson, the Personnel Council was made aware of a student complaint

---

3. Courts ... are understandably reluctant to review the merits of a tenure decision.... [T]riers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion. Moreover, the level of achievement required for tenure will vary between universities and between departments within universities. Determination of the required level in a particular case is not a task

for which judicial tribunals seem aptly suited. Finally, statements of peer judgments as to departmental needs, collegial relationships and individual merit may not be disregarded absent evidence that they are a facade for discrimination.
*Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2nd Cir.1984) (citation omitted). For a discussion of the factors that make a tenure decision unique, *see id.* at 92–93.

regarding Brousard–Norcross while the Council was considering her tenure application in late 1987. In response to this complaint, Olson sent student evaluation forms to students in Brousard–Norcross's Fall 1987 undergraduate classes. These forms were mailed out in December 1987. Brousard–Norcross contends that the occurrence of this "special evaluation" is evidence of sex discrimination and that the reliance of the Personnel Council on these evaluations raises a dispute as to whether the tenure denial reasons are merely pretextual. It is true that "[d]epartures from procedural regularity ... can raise a question as to the good faith of the [tenure decision] process," *Zahorik v. Cornell Univ.*, 729 F.2d 85, 93 (2nd Cir.1984). It would stand this proposition on its head, however, to say that an effort to obtain additional student evaluations in light of the Personnel Council's discovery of a student complaint is a deviation from the procedural norm sufficient to view the College's reasons for tenure denial as pretextual.[4]

The revision of the draft letter to be sent by the Personnel Council to Brousard–Norcross informing her of their negative recommendation also does not raise a material question of fact with respect to the pretextual issue. The revision is in no way indicative of any sex discrimination[5], nor does it rise to a level of inconsistency and contradiction, such as was evident in *Edwards v. United States Postal Serv.*, 909 F.2d 320, 322–24 (8th Cir.1990), sufficient to raise a factual dispute as to pretext.

### B.

Brousard–Norcross also claims that the second reason given for her tenure denial, negative recommendations from her colleagues, is pretextual. Brousard–Norcross points out that the overwhelming number of colleague letters in her tenure file support her tenure application, and that two of the "negative" recommendations are from males in the Department who allegedly made sexist remarks in the past. She further notes that her "pre-tenure review" was quite favorable.

Brousard–Norcross does not create a triable case on the issue of pretext by showing that most of the colleague letters in her tenure file supported her tenure bid. Augustana never claimed that the majority of her colleagues opposed her application; instead, the defendants point to the fact that none of the three chairpersons who headed the Education Department while Brousard–Norcross was in the Department formally supported her tenure application. The sole female chairperson, Harriet Hybertson, who chaired the Department in 1986–87, formally recommended against granting Brousard–Norcross tenure. Joint Appendix at 95. Larry Brendtro, who chaired the department from 1982–86, furnished an extensive colleague essay, but refrained from recommending either the granting or denial of tenure. Joint Appendix at 96–100. The third chair, Cecil Kipling, who headed the Department on an interim basis in 1987–88, did not supply a tenure evaluation of Brousard–Norcross.[6]

According to the uncontested statement of defendant Olson, Augustana never has granted tenure to anyone who received a negative recommendation from a department chair. Joint Appendix at 240. In Brousard–Norcross's case, one former de-

---

**4.** The full quote from *Zahorik* is instructive: "Departures from procedural regularity, *such as a failure to collect all available evidence,* can raise a question as to the good faith of the process where the departure may reasonably affect the decision." *Zahorik*, 729 F.2d at 93 (emphasis added).

**5.** The draft letter, dated January 12, 1988 states "there were two reasons for our recommendation to not grant tenure. The first, is the teaching evaluations by students indicate a majority of students are not satisfied with your handling of their classes." Joint Appendix at 40. The

revised letter, dated January 27, 1988, states "there were two reasons for our recommendation to not grant tenure. The first, is that the *current term* teaching evaluations by students indicate a majority of students are not satisfied with your handling of their classes." Joint Appendix at 41 (emphasis added).

**6.** Augustana claims that Kipling orally recommended against granting Brousard–Norcross tenure, Joint Appendix at 240 and 255, while Brousard–Norcross claims that he gave no recommendation at all.

partment chair gave her a negative recommendation, while the other two gave no formal recommendation at all. Brousard–Norcross claims that Brendtro's evaluation is "tainted" because of sexist remarks and attitudes he allegedly exhibited, as is the evaluation of Gene Nichols, a member of the Education Department who recommended against granting Brousard–Norcross tenure. Accepting this as true for purposes of this appeal, the uncontested fact remains that a former department chair recommended denying tenure to Brousard–Norcross. Such recommendations are, according to the uncontroverted statement of Olson, the "kiss of death" when it comes to tenure decisions. The negative recommendation by Hybertson is not seriously alleged to be a result of sex discrimination; neither can the Personnel Council's reliance on it be considered unlawful sex discrimination.[7]

The fact that Brousard–Norcross's "pre-tenure review" was positive also does not raise a material fact issue. By its very name, such a review is not the actual tenure decision.[8] To hold the College to the results of the pre-tenure review would require us to substitute such a review for the actual tenure decision process. This would have the effect of accelerating and materially altering the College's employment process, which we have no authority to do.

Because Brousard–Norcross has failed to establish a factual dispute with respect to whether the College's stated reasons for her tenure denial are pretexts for unlawful sex discrimination, we affirm the District Court's order granting the defendants' motion for summary judgment on Brousard–Norcross's Title VII claim.

## III.

■ The District Court also granted the defendants' motion for summary judgment on Brousard–Norcross's Rehabilitation Act claim, ruling that she had failed to establish a prima facie case of handicap discrimination. We agree.

"A prima facie case of discrimination consists of proof that the plaintiff is a member of a protected class, and that an adverse employment action was taken against the plaintiff in circumstances from which an inference of unlawful discrimination arises." *Johnson v. Legal Serv.*, 813 F.2d 893, 896 (8th Cir.1987). Brousard–Norcross is a member of a protected class, as she suffers from retinitis pigmentosa and is legally blind with correction. Further, an adverse employment action was taken against her, the denial of tenure. However, she has failed to allege any facts which would give rise to an inference of unlawful handicap discrimination.

Brousard–Norcross's only allegation of handicap discrimination arises from Brendtro's tenure evaluation. In his evaluation, Brendtro noted an instance where Brousard–Norcross had "refused to accept the assignment of student teachers as had been earlier arranged by former chair Hybertson." Joint Appendix at 99. Brousard–Norcross claims this statement raises an inference of discrimination, because, she claims, she was unable to accept the referred-to assignment as it required her to supervise out-of-town student teachers, an impossible task for her due to her vision impairment. This lone statement, however,

---

7. There is no evidence that any member of the Personnel Council made any sexist remarks concerning Brousard–Norcross or exhibited any kind of sexist attitude. All evidence of sex discrimination results from the comments and attitudes allegedly exhibited by Brendtro and Nichols, neither of whom served on the Personnel Council. Further, none of the negative colleague recommendations or negative student evaluations that were before the Council contain any hint of sex discrimination. Finally, it should be pointed out that the Personnel Council, consisting of five males and one female, voted five to one to deny Brousard–Norcross tenure. This vote did not split on gender lines, as Larry Sorenson was the sole member supporting Brousard–Norcross's tenure bid.

8. The pre-tenure review is not designed to be a final judgment on the merits of a tenure applicant. Instead, it is meant to serve as a screening process; receiving a "green light" at this stage does not necessarily mean an applicant is qualified for tenure. *See* Joint Appendix at 37. In addition, perceived problems with a faculty member's performance may arise initially or become more serious after the pre-tenure review has been completed.

taken out of context, is too slender of a reed upon which to base an inference of unlawful discrimination.[9]   Brendtro was not a member of the Personnel Council, and his comment contains no discriminatory comment or hint of a discriminatory attitude that would adversely affect the decision of the Personnel Council. There is no evidence that any of the Council members based their decision on a prohibited factor. Further, Brendtro's evaluation of Brousard–Norcross contained no recommendation either for or against Brousard–Norcross's bid for tenure. As noted in part II, *supra*, Harriet Hybertson, a former department chair, recommended that Brousard–Norcross be denied tenure. Based on our review of the record, we hold that Brousard–Norcross did not establish a prima facie case of handicap discrimination. Summary judgment was therefore appropriate on her Rehabilitation Act claim.

## IV.

■   Brousard–Norcross contends that the District Court erred in granting summary judgment to the defendants on her Equal Pay Act claim. The District Court ruled that there was not a substantial difference between Brousard–Norcross's pay and that of her peers sufficient to establish a submissible case.

■   As the basis for her claim, Brousard–Norcross compared her salary with two other faculty members at Augustana, Steven Van Bockern and Oscar Will, whose education and experience are roughly equivalent to Brousard–Norcross's.[10]   In

both 1985–86 and 1986–87, Brousard–Norcross made twenty-four dollars more than Will and seventeen dollars less than Van Bockern. Joint Appendix at 147. In 1987–88, she made 150 dollars less than Van Bockern. *Id.* Will apparently was granted tenure that year, so a comparison with him is not valid.[11]   Where the plaintiff's salary is marginally smaller than one comparator and marginally larger than another comparator, in a setting such as this where legitimate factors upon which to base salary differentials (*e.g.*, scholarly work and teaching performance) can result in finely calibrated evaluations, a submissible Equal Pay Act claim has not been established.

## V.

Finally, the District Court dismissed without prejudice Brousard–Norcross's pendent state law claims. As no independent basis for federal jurisdiction remained after the court's rulings on her federal claims, such dismissal was proper.

## VI.

We affirm the order of the District Court granting summary judgment for the defendants on Brousard–Norcross's federal law employment discrimination claims and dismissing without prejudice her pendent state law claims.

HEANEY, Senior Circuit Judge, dissenting.

I respectfully dissent from Part II of the majority's opinion. This case turns on whether the reasons proffered for Linda

---

9.   The relevant statement, contained in a section of Brendtro's evaluation of Brousard–Norcross entitled "Contributions to the Department," reads as follows: "At times she has used her workload as a reason for not becoming involved in chores not of her own choosing. Thus, since she had assumed certain entrepreneural [sic] courses this fall she refused to accept the assignment of student teachers as had been earlier arranged by former chair Hybertson." Joint Appendix at 99.

10.   According to Brousard–Norcross, in 1987 she was credited with six years of experience at Augustana and two years of external experience; Van Bockern was credited with five years of

experience at Augustana and no years of external experience; and Will was credited with five years of experience at Augustana and one year of external experience. Joint Appendix at 147. Additionally, Brousard–Norcross has a Ph.D., while Van Bockern has an Ed.D. *Id.*

11.   Brousard–Norcross's Equal Pay claims before March 30, 1986 are time-barred. 29 U.S.C. § 255(a) (1988); *see also Feng v. Sandrik*, 636 F.Supp. 77, 82–83 (N.D.Ill.1986) (filing a claim with the EEOC does not toll the Equal Pay Act statute of limitations). Further, any claim made for the school year 1988–89 fails, because the two comparators were both tenured at that time, making any such comparison ill-founded.

Brousard–Norcross' tenure denial were a pretext for unlawful discrimination in violation of Title VII of the Civil Rights Act of 1964. In my view, Professor Brousard–Norcross has established a factual dispute over whether the proffered reasons for her tenure denial were pretextual and is therefore entitled to a jury trial on that issue.

This case comes to us on summary judgment. "If the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Applying this standard to this case raises the issue of whether a reasonable fact finder could find that the proffered reasons for Brousard–Norcross's tenure denial were a pretext to mask sex discrimination. In making this determination, "the nonmoving party must be given the benefit of all favorable factual inferences." *Evans v. Pugh*, 902 F.2d 689, 691 (8th Cir.1990). Brousard–Norcross has raised genuine issues of material fact regarding Augustana's motives for denying her tenure, and thus, a reasonable jury could find that she was the victim of unlawful sex discrimination.

Brousard–Norcross chronicled several incidents which give rise to an inference that her sex factored into her tenure denial. During her job interview with Augustana, the then chair of the education department warned Brousard–Norcross against joining what the chair described as a "radical" campus women's group, because her involvement with such a group could affect her future with Augustana College. During a 1983–84 school year conference, this same individual again cautioned Brousard–Norcross against becoming too involved in feminist issues. During that same year, the chair related a story to Brousard–Norcross with the moral that in nature female animals are docile and timorous, while males are fearless, and that humans have something to learn from this fact.[12] On another occasion during that same year, the chair explicitly advised Brousard–Norcross that she was too aggressive and assertive for a woman.

Additional events suggest that the tenure denial was retaliatory. From 1982 through 1985 Brousard–Norcross expressly questioned her salary and teaching load relative to male faculty members. In response, the chair of the department warned Brousard–Norcross that she might not receive tenure if she questioned her salary. Another department member condemned Brousard–Norcross' salary complaints as inappropriately aggressive behavior, yet added that if a male made the same complaint, he would not consider such behavior to be aggressive. When the chair was denied tenure and the second department member was denied leave in 1985, they blamed the feminists for their denials and warned the feminists not to expect their support when the feminists became eligible for tenure or promotion. These two professors eventually supplied two of the three negative recommendations disapproving Brousard–Norcross' tenure application.

These events alone cast doubt on the defendants' motives for denying Brousard–Norcross tenure. Equally damning, however, was the defendants' deviation from the tenure evaluation process while considering Brousard–Norcross' application. Such a deviation had never occurred before. The deviation at issue was the Personnel Council's decision to distribute evaluation forms to Brousard–Norcross' Fall 1987 students after they had recessed for Christmas vacation. Compared with the normal classroom evaluation method, this mail survey garnered a relatively poor response—twenty evaluations returned out of thirty-two mailed. More importantly, distributing the evaluations during the recess created the probability that the students would be evaluating Brousard–Nor-

---

**12.** Specifically, the chair explained to Brousard–Norcross that he had a new brood of piglets and when the piglets experienced the springtime air for the first time, all the male pigs jumped out of the pen and into the open air without fear, while the female pigs pranced and cowered and refused to exit. According to the chair, the moral of the story was that people can learn a great deal about male and female behavioral differences from animals and that hormonal distinctions account for these differences.

cross after they had received their final grades. In fact, the evaluations contained at least seven negative comments regarding Brousard–Norcross' grading or testing practices. Moreover, some of the students who had the opportunity to evaluate Brousard–Norcross, after they had received their grades from her, had been graded lower by Brousard–Norcross than these students needed to qualify for student teaching assignments; these students certainly would not be able to fairly evaluate the professor whose grading had prevented them from becoming student teachers.

Some evidence suggests that the defendants knew that students might be able to evaluate Brousard–Norcross after receiving their grades. Although Brousard–Norcross taught three classes in the Fall of 1987, the Personnel Council mailed evaluations to the students in only two of her classes; many of the students in the solicited classes did not receive favorable grades. In contrast, the college inexplicably decided not to send evaluations to the third class of students; in the unsolicited class, all of the students earned "As". These facts give rise to the inference that illegal motives inspired the distorted evaluation process, particularly when considered with the comments of Brousard–Norcross' departmental colleagues.

Together the comments and the peculiar evaluation process suggest that the proffered reasons for the tenure denial were pretextual. The Personnel Council offered two reasons for its recommendation to deny Brousard–Norcross tenure: negative student evaluations from the Fall 1987 classes and nonpositive relationships with some of her department colleagues. The distortion in the student evaluation process has already been outlined. Two additional facts, however, suggest that this first proffered reason was mere pretext. First, prior student evaluations of Brousard–Norcross had been overwhelmingly positive. Second, after originally claiming that a majority of her former students were not satisfied with Brousard–Norcross' handling of

her courses, the Personnel Council redrafted its initial letter informing Brousard–Norcross of its negative recommendation in order to limit its reference to negative student evaluations to the Fall 1987 classes.

The majority's response to the student evaluation issue is alarming. According to the majority, "[i]t is not for us to determine what constitutes a sufficient amount of negative feedback from students before a denial of tenure is justified; ..." Under this reasoning, universities can rely on the slightest negative student reaction, regardless of its merit, to deny tenure. By bestowing such discretion on universities, the majority has effectively shielded these institutions from Title VII liability in the context of tenure decisions.

Examining the second proffered reason for the tenure denial, nonpositive departmental relationships, also discloses indications of pretext. As the majority recognizes, an overwhelming number of her colleagues favored granting tenure to Brousard–Norcross. In fact, eight of the ten faculty members who made a recommendation supported her tenure bid, with one of the negative recommendations coming from one of the male colleagues who was responsible for some of the sexist remarks referenced earlier.[13] In addition, Brousard–Norcross' tenure file was filled exclusively with positive recommendations from professional acquaintances and former students. Given these facts, there is a factual dispute as to whether Brousard–Norcross' colleagues supported her tenure application. Similarly, because two of the three negative recommendations came from the men who had made numerous and repeated disparaging, sexist remarks, it is debatable whether their opinions were anything more than a pretext for sex discrimination.

On summary judgment, this court need not reach the merits of the case before it. Instead, we review the record to ascertain whether there is a genuine issue of material fact. The burden of establishing the

13. The other professor who had berated Brousard–Norcross with regard to her feminism declined to cast an explicitly negative recommendation but nonetheless provided a substantively negative review of Brousard–Norcross' tenure application.

existence of a genuine issue of material fact rests with the nonmoving party. "Rule 56(e) [of the Federal Rules of Civil Procedure] permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). These referenced evidentiary materials include depositions and answers to interrogatories. *See* Fed.R. Civ.P. 56(c). Brousard–Norcross relied upon these very tools of discovery to develop the facts that have been recounted above. These facts create a genuine issue as to whether the proffered reasons for Brousard–Norcross' tenure denial were pretextual. In such a situation, summary judgment should not be entered against the nonmoving party.

For these reasons, I dissent from the majority's decision to affirm the district court's grant of summary judgment.