Michael J. TORI, Plaintiff–Appellant,

v.

MARIST COLLEGE, Defendant–
Appellee.

No. 08–5143–cv.

United States Court of Appeals,
Second Circuit.

Sept. 2, 2009.

Mark C. Rushfield, Shaw, Perelson, May & Lambert, LLP, Poughkeepsie, NY, for Plaintiff–Appellant.

Susan E. Galvão, Bleakley Platt & Schmidt, LLP, White Plains, NY, for Defendant–Appellee.

Present: ROBERT A. KATZMANN, PETER W. HALL, *Circuit Judges,* and EDWARD R. KORMAN, *District Judge.*[1]

### SUMMARY ORDER

Plaintiff Michael J. Tori appeals from a judgment of the district court (Karas, *J.*) entered September 12, 2008, granting defendant Marist College's ("Marist") motion for summary judgment and closing the case. Dr. Tori—a single, white, male, Christian—brought claims under, *inter alia,* Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* and various state laws, alleging discrimination on the basis of race, gender, marital status, and religion and retaliation for protected conduct arising from Marist's denying Dr. Tori tenure in June 2004 and refusing to hire him as an adjunct professor to teach a five-week summer course in June 2005. We assume the parties' familiarity with the facts, procedural history, and issues on appeal.

On a motion for summary judgment, the moving party bears the initial burden of establishing that there are no genuine is-

---

1. The Honorable Edward R. Korman, of the United States District Court for the Eastern District of New York, sitting by designation.

sues of material fact. However, once such a showing is made, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (internal quotation marks omitted). In this regard, "unsupported allegations do not create a material issue of fact." *Id.*

In a discrimination case such as this, where there is no direct evidence of discriminatory conduct, we employ the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Fisher v. Vassar Coll.*, 114 F.3d 1332, 1335–36 (2d Cir.1997) *(en banc), abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Under this familiar framework, the plaintiff must first establish a prima facie case of discrimination by showing that: (1) he is a member of a protected class; (2) he was qualified to be a tenured professor; (3) he suffered an adverse employment action in the denial of tenure; and (4) the circumstances give rise to an inference of discrimination. *See Weinstock*, 224 F.3d at 42. The defendant must then articulate a legitimate, non-discriminatory reason for the denial of tenure. Once the defendant has articulated such a reason, the presumption of discrimination disappears, and the question in reviewing a motion for summary judgment becomes whether the evidence, when viewed in the light most favorable to the plaintiff, is sufficient to sustain a reasonable finding that the denial of tenure was motivated, at least in part, by discrimination. *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 114 (2d Cir.2007). In this regard, "[t]he plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, *and*

*that more likely than not discrimination was the real reason for the employment action* .... To get to the jury, it is not enough ... to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination." *Weinstock*, 224 F.3d at 42 (internal quotation marks and alterations omitted and emphasis added); *see also Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

Retaliation claims are analyzed under the same three-part burden shifting framework. The plaintiff must first establish a prima facie case by showing that: (1) he participated in a protected activity; (2) the defendant knew of the protected activity; (3) he suffered an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse action. *McMenemy v. City of Rochester*, 241 F.3d 279, 282–83 (2d Cir.2001). If the plaintiff sustains this burden, the employer must then articulate a legitimate, non-retaliatory reason for the adverse employment action. Once the employer offers such a reason, the presumption of retaliation disappears and "the employee must show that retaliation was a substantial reason for the adverse employment action." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir.2005).

■ As to the denial of tenure in June 2004, "tenure decisions in an academic setting involve a combination of factors which tend to set them apart from employment decisions generally," and courts are "understandably reluctant to review the merits of a tenure decision." *Zahorik v. Cornell Univ.*, 729 F.2d 85, 92, 93 (2d Cir. 1984).

[F]or a plaintiff to succeed in carrying the burden of persuasion, the evidence as a whole must show more than a denial of tenure in the context of disagreement about the scholarly merits of the candidate's academic work, the candi-

date's teaching abilities or the academic needs of the department or university. *Absent evidence sufficient to support a finding that such disagreements or doubts are influenced by forbidden considerations such as sex or race,* universities are free to establish departmental priorities, to set their own required levels of academic potential and achievement and to act upon the good faith judgments of their departmental faculties or reviewing authorities. *Id.* at 94 (emphasis added).

In this case, Dr. Tori's discrimination claim fails because he has introduced no evidence to suggest that the denial of tenure was motivated, at least in part, by discrimination on the basis of race, gender, marital status, or religion.

Dr. Tori first argues that Marist's legitimate, non-discriminatory reason for the tenure denial, namely that Dr. Tori's scholarship was unsatisfactory, is pretextual because Academic Vice President ("AVP") Artin Arslanian advised him, prior to his hire, that acceptance for publication of at least one peer reviewed published article would be all that was required to meet the scholarship requirements for tenure, and Dean Thomas Wermuth told members of Dr. Tori's department that two refereed articles would constitute satisfactory scholarship for a tenure candidate. None of this establishes that Marist had an objective "two peer-reviewed published articles standard," as Dr. Tori claims, and, even if it did, Tori has introduced no evidence to rebut the evidence submitted by Marist that the college judged the quality, not just the quantity, of its professors' scholarly work for tenure-review purposes. Indeed, Dean Wermuth's 2002 evaluation, upon which Dr. Tori relies, notified Tori in writing that "[a]s you approach your tenure-review, you will need, at the very least, one more, strong article-length contribution in a peer-reviewed journal appropriate to your field." This warning was repeated in Dr. Tori's 2003 review.

■ Dr. Tori also points to the fact that two outside scholars, whose views he solicited after the Peer Review Committee ("PRC") voted to deny tenure, concluded that his published articles were strong; that Professor Mar Peter–Raoul, the only tenured Religious Studies professor at Marist, concluded that Dr. Tori's output stood "well with other candidates being recommended for tenure"; and that the four members of the Rank and Tenure Committee who recommended granting tenure found Dr. Tori's scholarship satisfactory. However, "[w]here the tenure file contains the conflicting views of specialized scholars, triers of fact cannot hope to master the academic field sufficiently to review the merits of such views and resolve the differences of scholarly opinion." *Zahorik,* 729 F.2d at 93. The fact that some scholars viewed Dr. Tori's scholarship as satisfactory or even exemplary does not create a genuine issue of material fact to preclude summary judgment.

■ Dr. Tori also points to four individuals (two women, one black male, and one Jewish male) whose scholarship, he argues, was less satisfactory than his, and yet, who were granted tenure. However, the conclusory assertion that women or minority candidates who were granted tenure were less qualified than Dr. Tori "adds nothing to [his] claim since the record at best indicates a difference of opinion in evaluation of scholarly merit." *Id.* at 94. Moreover, none of these individuals worked in Dr. Tori's department. One was an Assistant Professor of Business, one was an Assistant Professor of Broadcast Journalism, one was an Assistant Professor of Environmental Science, and one was an Assistant Professor of Teacher Education. As we have previously held, "[a] denial of tenure by [one] department simply cannot

be compared with a grant of tenure in [other] departments." *Id.* at 93.

■ Dr. Tori also points to a number of alleged procedural irregularities that infected his tenure review process. While departures from tenure procedures "can raise a question as to the good faith of the process where the departure may reasonably affect the decision," summary judgment is appropriate where there is no evidence that discrimination played a role in any alleged procedural irregularities. *Weinstock,* 224 F.3d at 45 (internal quotation marks and emphasis omitted). In this case, there is no evidence to support many of the procedural irregularities on which Dr. Tori relies.

First, the faculty handbook requires that the Peer Review Committee for tenure candidates consist of "all tenured Faculty members in the discipline," except those who are on sabbatical or other official leave, or who sit on the Rank and Tenure Committee. Dr. Tori has introduced no evidence to support his assertion that while he was a member of the Philosophy and Religious Studies *Department,* Philosophy and Religious Studies are two different academic *disciplines* and therefore the Faculty Handbook required Dean Wermuth to select members for the Peer Review Committee from among faculty members in a related discipline and not from members of his department. Nor has he introduced evidence that he ever attempted to challenge the selections from outside of his discipline, as the Handbook permitted him to do. Second, Dr. Tori points to no rule that precluded the Peer Review Committee from considering a letter that had been submitted, and then withdrawn, by a student four years earlier.[2] Therefore, these alleged procedural irregularities do not create a genuine issue of mate-

rial fact as to whether the college was motivated, at least in part, by discrimination on the basis of gender, race, marital status, or religion. In fact, of forty white male candidates who were considered by Marist for tenure or promotion between 1998 and 2006, 95% received tenure, promotion, or both. For women or other minority candidates, the rate was 83.9%.

■ As to Dr. Tori's retaliation claim, there is no evidence to suggest that retaliation was a substantial reason for the denial of his application for tenure. Dr. Tori has introduced no evidence to support his theory that, in 2004, Professor Ed Donahue sabotaged his tenure application in retaliation for Dr. Tori complaining, in 1998–99, that the faculty search committee's refusal to consider Dr. Kim Paffenroth, after it was discovered that he was male, constituted reverse discrimination. Dr. Tori obviously cannot rely on temporal proximity to establish the requisite causal link between his protected activity in 1998–99 and the denial of tenure more than five years later. *See, e.g., Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). He has also introduced no direct evidence of retaliatory animus on the part of Professor Donahue. Although he now claims that Donahue had retaliated against him for years, in all of the complaints that Dr. Tori lodged against Professor Donahue for alleged mistreatment, Dr. Tori never once alleged that the mistreatment was in retaliation for the incident involving Dr. Paffenroth in 1998–99.

■ The same is true for Marist's refusal to hire Dr. Tori as an adjunct professor to teach a five week class during the summer of 2005. Even if the three months

---

**2.** The fact that the Ad Hoc Grievance Committee created to investigate Dr. Tori's grievance complaint concluded that the PRC's reliance on the letter violated Dr. Tori's right to review all of the information contained in his file does not change our decision.

between the time Dr. Tori filed his EEOC complaint and the time he was not hired for the position were sufficient to establish a causal connection for purposes of the prima facie case, *but see Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990) (three month period not sufficient to establish causal nexus for purposes of prima facie case), Marist came forth with a legitimate, non-discriminatory reason for the decision, to wit, Arslanian believed that it was the practice of Marist not to bring back faculty members who had gone through the formal tenure review process, been denied, and whose contracts had then been allowed to expire.

Dr. Tori has introduced no evidence to suggest that this reason was pretextual and that retaliation was a substantial reason for the decision. Indeed, according to Dr. Tori, on June 9, 2004, President Murray said that it would "not be a problem" if Dr. Tori applied for future positions at Marist. Moreover, on June 15, 2005, Dr. Joseph D. Ross emailed Dr. Tori to inquire about his availability to teach, as an adjunct professor, a World Views and Values class during July and August of that year. This was two months *after* Dr. Tori filed his complaint with the EEOC, and therefore constitutes strong evidence that Marist did not act with retaliatory animus.

We have considered all of Plaintiff's other arguments and find them without merit. Accordingly, the judgment of the district court is AFFIRMED.