Ayesha JALAL, Plaintiff,

v.

COLUMBIA UNIVERSITY IN THE
CITY OF NEW YORK,
Defendant.

No. 96 Civ. 5175(SAS).

United States District Court,
S.D. New York.

March 9, 1998.

226

Debra L. Raskin, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for Plaintiff.

Robert D. Kaplan, Friedman Kaplan & Seiler LLP, New York City, for Defendant.

### OPINION AND ORDER

SCHEINDLIN, District Judge.

Title VII of the Civil Rights Act of 1964 does not appear, on its face, to be a particularly complex statute. The application of its seemingly straightforward mandate, however, has proven in many cases to be fiendishly difficult: Unearthing invidious discrimination in the workplace, for instance, without abridging an employer's right to make its own employment decisions or deterring debate on controversial subjects often requires courts and juries to make extremely careful judgments.

The present case exhibits many of the characteristics that make Title VII cases so troublesome: a highly subjective employment decision of debatable wisdom, the involvement of many people in a multi-stage decisionmaking process, and evidence of bias that is undeniably thin, but nevertheless suggestive.[1] The paramount problem presented by this case stems from the difficulty of distinguishing items of evidence—particularly ambiguous statements made by decisionmakers—that support a permissible inference of bias from those that merely provide grounds for speculation. The trier of fact is ultimately charged with the responsibility for

---

1. The problems posed by these issues have been compounded by the herculean efforts of plaintiff's counsel, whose investigation into plaintiff's allegations of prejudice has been conducted with indefatigable zeal. In a transparent attempt to bolster a tenuous case, counsel has inundated the court with a vast array of "evidence" that, while it may support speculation, clearly fails to support a rational inference of discrimination. *See, e.g.,* note 13, *infra.* The court would be unreserved in its admiration for the thoroughness of this effort were it not for the fact that this "evidence" is long on quantity but short on quality. *See id.*

deciding which is which. At the summary judgment stage, however, the court must also engage in this exercise to determine whether there is sufficient evidence to support a rational jury verdict for the plaintiff. While this evidence may include inferences drawn from other facts, it cannot include mere speculation inspired by those facts. This decision addresses the often subtle distinction between the two.

Plaintiff Ayesha Jalal ("Jalal") filed a Complaint on July 10, 1996, asserting that defendant Columbia University ("Columbia") unlawfully discriminated against her based on her national origin and religion.[2] A history professor of international repute, plaintiff claims that Columbia's decision to deny her tenure was based on a discriminatory motive. Plaintiff further contends that Columbia retaliated against her for raising her claim of bias by refusing to reconsider its decision. Defendant now moves for summary judgment pursuant to Fed.R.Civ.P. 56(b). For the reasons stated below, defendant's motion is granted.

## I. Factual Background

### A. Jalal's Background, Hiring and Departmental Tenure Review

Except as otherwise indicated, the following facts are undisputed. Jalal was born and raised in Pakistan and has been a practicing Muslim from childhood. *See* Affidavit of Ayesha Jalal ("Jalal Aff.") at ¶¶ 2–3. She was hired by Columbia as an associate professor of history in 1991. *See id.* at ¶ 1. In 1993, Columbia's history department began the process of reviewing Jalal for tenure; in early 1994, this process was suspended, purportedly for financial reasons. *See id.* at ¶¶ 12–17. It began again in the 1994–95 academic year. *See* Jalal Aff., Ex. 2 at 72.

After a review of Jalal's publications and referee letters, the History Department Personnel Committee met on January 20, 1995, and voted unanimously in favor of recommending her for tenure. *See id.* at 73. This recommendation was seconded five days later by an almost unanimous vote of the tenured members of the department as a whole. *See id.* Jalal's candidacy then moved to the next stage, review by a non-departmental ad hoc committee.

### B. Selection of Jalal's Ad Hoc Committee

Ad hoc committees consist of five tenured members of the Columbia faculty, one of whom serves as chair. *See* Affidavit of Patricia Sachs Catapano ("Catapano Aff."), Columbia Associate General Counsel, Ex. 2 at 548. The vote of the ad hoc committee is communicated to the Provost, who makes the final tenure decision, subject to limited review by the University President. *See id.* at 550. In theory, the Provost may disregard the recommendation of the ad hoc committee, regardless of the outcome of the vote. *See id.* In practice, however, a unanimous or four to one vote by the ad hoc committee is determinative. *See* Defendant's Statement Pursuant to Local Civil Rule 56.1 ("Def's 56.1") at ¶ 4; Plaintiff's Statement Pursuant to Local Civil Rule 56.1 ("Pl's 56.1") at ¶ 4.

The membership of a candidate's ad hoc committee is determined by the Provost in consultation with a body called the Tenure Review Advisory Committee ("TRAC"). *See id.* TRAC makes its ad hoc recommendations with regard to the following principles: 1) Departmental diversity on an ad hoc committee is desirable, though not necessary, 2) faculty from a candidate's department are ineligible for that person's committee, 3) faculty with other significant administrative responsibilities should be avoided, and 4) the faculty chosen should be capable of making an informed, independent review of the candidate's qualifications. *See* Deposition of Stephen Alan Rittenberg, Columbia Vice Provost for Academic Administration ("Rittenberg Dep.") at 82–84. TRAC consists of the Vice President for Arts and Sciences, the Vice President for Health Sciences, the Dean of the Graduate School of Arts and Sciences and four members of the tenured faculty selected by the Provost. *See id.*

---

2. Plaintiff asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the New York State Human Rights Law, Executive Law § 290 *et seq.*, and the New York City Human Rights Law, Administrative Code of the City of New York § 8–101 *et seq.*

For tenure candidates in the arts and sciences, the TRAC process is initiated by the Vice President for Arts and Sciences, who recommends a number of faculty as potential ad hoc committee members. *See id.* at 70–71. Vice President Steven Marcus performed this task with regard to the Jalal ad hoc. *See* Deposition of Jonathan Cole, Columbia Provost ("Cole Dep.") at 38. TRAC documents from January, 1994 to October, 1996 list eleven people under the heading "DEAN's/VP's RECOMMENDATION," including four who ultimately served: Elaine Combs–Schilling of the anthropology department, Helen Milner and Gerald Curtis of the political science department and Harrison White of the sociology department. *See* Catapano Aff. at Ex. 5; Affidavit of Debra L. Raskin, plaintiff's attorney ("Raskin Aff.") at Ex. 13. TRAC then had a series of meetings to consider these recommendations and make its own. *See* Rittenberg Dep. at 134. It ultimately recommended Curtis, Combs–Schilling, Akeel Bilgrami of the philosophy department, Madeline Zelin of the East Asian languages and cultures department and Indian-born economist Padma Desai. *See* Catapano Aff. at Ex. 5. The Provost, Jonathan Cole, chose Desai, Combs–Schilling, Curtis, Milner and White, with Desai as chair. *See* Jalal Aff., Ex. 2 at 2; Cole Dep. at 33. It is not clear who originally proposed Desai as a committee member. Vice Provost Alan Rittenberg has testified that he initially raised her name in a conversation with TRAC member Jagdish Bhagwati, Desai's husband. *See* Rittenberg Dep. at 124–25. Bhagwati agrees. *See* Deposition of Jagdish Bhagwati ("Bhagwati Dep.") at 129. However, Cole testified that Desai was suggested by a member of TRAC. *See* Cole Dep. at 65. While Rittenberg sometimes attended TRAC meetings, *see* Cole Dep. at 41, he is not a member. *See* Jalal Aff., Ex. 2 at 2. It was Cole who suggested that Desai serve as chair. *See* Pl's 56.1 at ¶ 6(b); Bhagwati Dep. at 128.

## C. Evidence of Bias in TRAC Proceedings

Jalal concedes that there is no evidence to suggest that the subject of her national ori-gin or religion was discussed at any TRAC meeting. *See* Def's 56.1 at ¶ 6(a); Pl's 56.1 at ¶ 6(a). However, she contends that bias nevertheless played a role in the TRAC proceedings via the participation of Bhagwati and Cole.

### 1. Bhagwati

Jalal asserts that Bhagwati, who is of Indian origin, demonstrated discriminatory animus towards Pakistanis and/or Muslims when he allegedly said, "you can't expect a Pakistani to teach the history of India" to a colleague sometime in the 1994–95 academic year. Deposition of Leonard Gordon, professor, City University of New York ("Gordon Dep.") at 64. Jalal also contends that Bhagwati displayed bias by stating to a graduate student who studied under Jalal: "I hear your professor is being denied tenure" with a "huge smile on his face" shortly after Jalal's candidacy had been put on hold in early 1994. *See* Deposition of Mridu Rai ("Rai Dep.") at 138–39.

Jalal does not, however, allege that Bhagwati had any direct input into the decision to deny her tenure; his purported bias could only have had an effect through TRAC's suggestion of biased ad hoc committee members.[3] There is little specific evidence tying any act of Bhagwati to any particular TRAC recommendation, though it is undisputed that he participated in TRAC meetings. Jalal suggests that he may have played a more significant decisionmaking role with regard to her ad hoc than other committee members in that he was the only social scientist on TRAC at the time. *See* Cole Dep. at 50–52, 43 ("Those members of TRAC who have expertise in an area tend to be greater contributors to candidates in their own areas or related areas."). Jalal also points to Bhagwati's testimony indicating that he may have opposed the selection of Bilgrami (a Muslim), on the grounds that Bilgrami is a philosopher rather than a social scientist. *See* Bhagwati Dep. at 123–27. On the other hand, TRAC did in fact recommend Bilgrami—whether or not over Bhagwati's objection—although he was not ultimately chosen by Cole. *See* Cata-

---

**3.** Jalal also suggests that Bhagwati's alleged bias can be imputed to Desai. *See infra* Part III.A.4.

pano Aff., Ex. 5. Moreover, there is uncontradicted testimony that Bhagwati refrained from speaking on the subject of Desai's selection. *See* Bhagwati Dep. at 129. Nevertheless, according to Jalal, Bhagwati's influence in TRAC led to the appointment of two members of her ad hoc, Desai and White, who she believes were biased against her because of her national origin and religion.[4]

## 2. Cole

Jalal does not proffer any direct evidence of bias on the part of Cole. She suggests instead that bias can be inferred from the fact that he was warned about the potential impact of ethnic hostility on the Jalal tenure candidacy and did nothing to eliminate it. Then–History Department Chairman William Harris[5] spoke to Cole in the spring of 1994, and asked him to "take note of the ethnic sensitivities that existed on the subject," specifically hostility between Indians and Pakistanis. Deposition of William Vernon Harris ("Harris Dep.") at 119, 122. Harris made this request after having been informed by Jalal that either Bhagwati or Desai had made arguably discriminatory comments in a conversation with a graduate student.[6] Harris did not, however, relate to Cole the basis for the request. *See id.* at 113–19.

Rittenberg testified that after the ad hoc had met, Harris told him that Desai had been named in Harris's conversation with Cole as an example of a person whose objectivity was questionable. *See* Rittenberg Dep. at 179–

181. According to Gordon and Jalal, Harris told them the same thing. *See* Gordon Dep. at 28–29; Jalal Aff. at ¶ 28. Tufts professor Sugata Bose alleges that in a conversation with Bilgrami, Bilgrami suggested that Cole had admitted that he may have been warned about Desai before she was selected to the committee. *See* Affidavit of Sugata Bose ("Bose Aff.") at ¶ 5. While Cole was in theory the person who made the final decision to deny her tenure, Jalal admits that, in reality, the decision is left to the ad hoc committee. *See* Def's 56.1 at ¶ 4; Pl's 56.1 at ¶ 4. Thus, her allegations regarding Cole require an inference that Cole's bias was expressed through his selection of Desai and White for the ad hoc committee.[7]

## D. Evidence of Bias on the Part of Ad Hoc Committee Members

As to Desai, Jalal asserts that she exhibited bias in a conversation she had with one of Jalal's graduate students in early 1994. Desai is alleged to have asked the student, also a woman of Indian origin, how she felt about working with a Pakistani. When the student responded that Jalal's nationality made no difference to her, Desai allegedly responded, "No, but I have heard that she holds and expresses distinctly anti-Indian views," and refused to be dissuaded from this position. *See* Deposition of Mridu Rai at 118–19. Jalal also points to a portion of Desai's testimony in which she recalled that thirty years earlier she had been passed over for promotion at

---

4. White's name, unlike Desai's, appears on TRAC documents as having been recommended by Vice President Marcus rather than TRAC. *See* Catapano Aff. at Ex. 5; Raskin Aff. at Ex. 13.

5. Harris had been replaced as History Department Chair by Professor Kenneth Jackson by the time Jalal's ad hoc committee met on June 12, 1995. *See* Affidavit of Robert D. Kaplan, defendant's counsel ("Kaplan Aff."), at ¶¶ 8–9.

6. The parties now agree that the comments, the alleged contents of which are described *infra*, at Part I.D., were made by Desai. Jalal's conversation with Harris, the contents of which were allegedly communicated to Cole, form the basis of Jalal's retaliation claim. See Part III.B. *infra*.

7. Jalal also suggests that Cole's bias can be inferred from the fact that he scheduled the ad hoc

committee meeting for a time when witnesses crucial to her candidacy were not available. There is no evidence, however, that Cole was aware of the witnesses' schedules before the date was chosen. Jalal cites the testimony of history professor Carol Gluck in which Gluck describes expressing to History Department Chairman Kenneth Jackson her concern about the availability of witnesses. Jackson, however, assured her that additional witnesses would not be necessary, as the meeting would be a "shoo-in." Deposition of Carol Gluck ("Gluck Dep.") at 154–55. Rittenberg testified that Jackson was given the opportunity to change the date of the meeting to accommodate witnesses, but declined to do so. Rittenberg Dep. at 161. Jackson testified that he expressed no opposition to the date chosen. *See* Deposition of Kenneth T. Jackson ("Jackson Dep.") at 383. Jalal does not allege that Jackson, one of her most ardent supporters, was biased against her.

the Delhi School of Economics in favor of a less qualified man. *See* Deposition of Padma Desai ("Desai Dep.") at 599–601. In recounting this story, Desai mentioned that the man who received the promotion was a Muslim, though she said that this was irrelevant to the decision. *See id.* at 601.

As to White, Jalal asserts that his comments during the ad hoc meeting betray bias. Notes of the meeting show that he compared Jalal's work to that of a "White" Russian studying Soviet history or a "Vermont historian . . . talk[ing] in favor of the Confederacy." *See* Raskin Aff., Ex. 14 at 646. At deposition, he explained that these analogies were meant to express his characterization of Jalal as a revisionist historian; i.e., his belief that her views on particular historical events—particularly the creation of Pakistan as an independent nation—are in conflict with historical ideas that are widely accepted in Pakistan. *See* Deposition of Harrison C. White ("White Dep.") at 201–03. In this context, he also testified that, "It would be hard for me to imagine Professor Jalal happily going back to Pakistan and making her career there." *See id.* at 203.

## E. Preparation for the Jalal Ad Hoc Committee Meeting

Each ad hoc committee member reviewed Jalal's work in preparation for their meeting. Given Jalal's theory that the bias of Desai and White infected the decision of the committee as a whole, a member-by-member review of this preparation is warranted.

### 1. Combs–Schilling

Combs–Schilling took a week off from her regular duties to read Jalal's three books and numerous articles. *See* Deposition of M. Elaine Combs–Schilling ("Combs–Schilling Dep.") at 112. At the end of this process, she had decided to vote against tenure based on her assessment that Jalal's recent work was neither particularly original nor well-researched. *See id.* at 118–121. She spoke with Desai once or twice before the ad hoc meeting, but nothing substantive was discussed.[8] *See* Desai Dep. at 480.

### 2. Milner

Milner also spent a week reading Jalal's publications. *See* Deposition of Helen Milner ("Milner Dep.") at 143–44. She spoke with Desai twice before the meeting. Nothing of substance was discussed during the first of these conversations. *See id.* at 121. During the second, Milner expressed her opinion that Jalal's work was on a "downward trajectory" and that it lacked analytical rigor. *See id.* at 122–23. Milner does not recall Desai expressing an opinion on the subject at that time. *See id.* at 122. Milner was "leaning" towards voting against tenure going in to the ad hoc meeting, though she had not made any firm decision. *See id.* at 198–99.

### 3. Curtis

Curtis took several days to read Jalal's work. *See* Deposition of Gerald L. Curtis ("Curtis Dep.") at 152–53. Like Combs–Schilling and Milner, he concluded that Jalal's latter two books were much weaker than her first. *See id.* at 156–60. He had not decided how to vote, however, before the meeting began. *See id.* at 167. He had one purely administrative conversation with Desai before the ad hoc meeting. *See id.* at 130–31.

### 4. White

White read Jalal's books and some of her articles in preparation for the ad hoc; after speaking to Desai, he read each book again. *See* White Dep. at 146–48, 250–51. He felt the tenure decision would be a "complicated" one; his concerns included the geographic scope of Jalal's work, given the size of the already-large history department, *see id.* at 151–52, 198–99, what he perceived as a "dismissive" quality in her historical analysis, *see id.* at 168, 204–08, and his perception that the quality of her work had declined. *See id.* at 214–15. He spoke with Desai before the ad hoc meeting and expressed these concerns. *See id.* at 189. Desai again refrained from expressing her views at that time. *See id.* at 198; Desai Dep. at 359. There is no evi-

---

8. As chair, Desai was responsible for contacting each member of the ad hoc committee to ensure that sufficient materials had been provided. *See* Def's 56.1 at 11(a); Pl's 56.1 at 11.

dence, however, that White had decided to vote against tenure before the meeting convened.

### 5. Desai

It is not clear how much time Desai spent in reading Jalal's work or whether she had reached a conclusion about which way to vote before the meeting. She did conclude from her reading, however, that Jalal's third book was markedly inferior to her previous ones, the first of which she described as "impressive." *See* Desai Dep. at 359.

### F. The Ad Hoc Committee Meeting

The ad hoc committee met on June 12, 1995. *See* Jackson Dep. at 229. According to Desai's Report, the meeting began with the appearance of two witnesses, Professor Jackson and literature professor Gayatri Spivak. Jackson spoke first, strongly recommending Jalal's candidacy. He then fielded questions from members of the committee, the tone of which quickly turned negative. *See* Jalal Aff., Ex. 2 at 8–9. Curtis remarked that he felt Jalal's latest book was "glib," and that her work in general showed "no progression of research." White noted that he "felt like [he] was reading a newspaper" when examining Jalal's work, and that her prose was, in his opinion, "tortured." *Id.* at 9. Milner said that she was struck by the lack of evidentiary support in Jalal's books, a reaction that White shared. *See id.;* Cole Dep. at 186 ("I think [the committee] found the work tending to be polemical, argumentative, rather than dealing with the full weight of the evidence...."). Jackson stoutly rose to Jalal's defense against all these charges. *See* Jalal Aff., Ex. 2 at 8–10. Spivak appeared as Jalal's second witness and praised her flexibility and originality, but was asked few questions. *See id.* at 10.

Desai, as chair, began the committee's deliberations by suggesting that four issues be considered: The geographical scope of Jalal's work, the degree to which she successfully combined the historical and political science aspects of her scholarship,[9] her undergraduate teaching, and the leadership she could be expected to provide Columbia's Southern Asian Institute. As to the fourth question, she reported that the current Institute director, John Hawley, regarded her administrative style as "acerbic and confrontational" and suggested that she would be a "disaster" as director. *Id.*

Little, if any, discussion of these issues took place, however. White opened the discussion by indicating that he felt Jalal's work had "a dismissive quality," and that she came across as someone "who had gotten adrift from reality." Combs–Schilling expressed her opinion that Jalal had "one idea" and that her books were declining in quality. *See id.,* Combs–Schilling Dep. at 306; Cole Dep. at 154 ("There was a clear sentiment expressed by members of the Ad Hoc that there had been ... a downward trajectory in the quality of [Jalal's] work."). Curtis said Jalal deserved credit for looking at the "big picture," an assessment with which Milner agreed. Milner also referred to at least one aspect of Jalal's scholarship as "first-class, star-quality work," Raskin Aff., Ex. 19 at 604, and noted that her reference letters were "strong," though she also indicated that she was not overly impressed by Jalal's scholarship as a whole. *See* Milner Dep. at 227–28. Curtis also suggested that Jalal's third book dealt with "big concepts ... but not in a scholarly way." Jalal Aff., Ex. 2 at 11; *see* Curtis Dep. at 167–68. When a vote was taken, it was unanimously negative. *See* Jalal Aff., Ex. 2 at 11, Jalal concedes that no discussion of her religion or national origin occurred during the committee's deliberations. *See* Def's 56.1 at ¶ 12(d); Pl's 56.1 at ¶ 12(d).

### G. Jalal's Request for a Second Ad Hoc is Denied

Columbia's tenure procedures provide for a second ad hoc committee review "if the Provost determines that the first was marked by procedural irregularities of a

---

9. These issues were raised, according to Desai's report, in a way that arguably cast them in a light unfavorable to Jalal: "First, was she a scholar of South Asia or was her focus narrowly confined to Pakistan? Second, was she a historian or a political scientist? Was she able to combine the two disciplines effectively?" Jalal Aff., Ex. 2 at 10.

magnitude which cast doubt on its thoroughness or impartiality." Catapano Aff., Ex. 3 at 550. After Jalal's ad hoc meeting, Harris asked Cole to make such a determination because of Desai's participation, having been prompted to do so by Jalal. Cole declined on the ground that he had been presented with no "concrete" evidence of Desai's bias. Affidavit of Lisa Gersh Hall, Counsel for Columbia, Ex. 26 at 663–64. This suit followed.

## II. Legal Standard for Summary Judgment

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997).

In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See D'Amico v. City of New York*, 132 F.3d 145, 148 (2d Cir.1998). Courts must be particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is at issue. *See Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). Even in these cases, however, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." *Schwapp*, 118 F.3d at 110. "[M]ere speculation and conjec-

ture" is similarly insufficient. *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986)). Instead, the plaintiff "must come forward with evidence that would be sufficient to support a jury verdict in [her] favor." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14 (2d Cir.1995).

## III. Discussion

### A. National Origin and Religious Discrimination

Title VII of the Civil Rights Act of 1964 provides that: "It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).[10] A Title VII plaintiff can prove that illegal discrimination has occurred by use of either a "pretext" or a "mixed motive" analysis. *See Stratton v. Department for the Aging*, 132 F.3d 869, 878 (2d Cir.1997).

Pretext analysis requires application of what has recently been described as "the much criticized yo-yo rule" of shifting burdens originally established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Bickerstaff v. Vassar College*, 992 F.Supp. 372, 373 (S.D.N.Y.1998). Under this rule, a plaintiff must first establish, by a preponderance of the evidence, a prima facie case that illegal discrimination has occurred. *See Scaria v. Rubin*, 117 F.3d 652, 653 (2d Cir.1997). A prima facie case is established in a denial of tenure suit when the plaintiff shows that 1) she belongs to a protected class, 2) she was qualified for tenure, 3) she was denied tenure and 4) tenure was granted to a person not in the protected class. *See Fisher v. Vassar*

10. For the purposes of resolving this motion, Jalal's claims under the New York State and New York City Human Rights Laws are indistinguishable from her Title VII claim. *See Torres v. Pisano*, 116 F.3d 625, 629 n. 1 (2d Cir.1997) ("We have repeatedly noted that claims brought under New York State's Human Rights Law are

analytically identical to claims brought under Title VII."); *Burger v. Litton Indus., Inc.*, No. 91 Civ. 0918, 1996 WL 421449, at *18 (S.D.N.Y. Apr. 25, 1996), *adopted*, 1996 WL 609421 (S.D.N.Y. Oct.22, 1996) (analysis of claim under New York City Human Rights Law is basically identical to Title VII analysis).

*College,* 114 F.3d 1332, 1344 (2d Cir.1997).[11] A plaintiff is "qualified" within the meaning of the second prong of this test when she can show that "some significant portion of the departmental faculty, referrants or other scholars in the particular field hold a favorable view on the question." *Zahorik v. Cornell Univ.,* 729 F.2d 85, 93–94 (2d Cir.1984). The level of proof the plaintiff must present in order to demonstrate a prima facie case is "minimal," *Fisher,* 114 F.3d at 1337, and need not support a rational jury verdict in her favor. *See id.*

Once the plaintiff's prima facie burden is met, the defendant must "produc[e] evidence that the plaintiff was [denied tenure] . . . for a legitimate, nondiscriminatory reason." *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). If the defendant establishes such a reason, the presumption of discrimination established by the prima facie case disappears, and the plaintiff "must . . . point to sufficient evidence to reasonably support a finding that [she] was harmed by the employer's illegal discrimination." *Fisher,* 114 F.3d at 1337.

A "mixed motive" analysis also provides for a shifting of burdens, but under different circumstances and with different consequences. To warrant a mixed motive burden shift, a plaintiff must "focus [her] proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the [challenged] employment decision." *Tyler v. Bethlehem Steel Corp.,* 958 F.2d 1176, 1181 (2d Cir.1992) (quoting *Price Waterhouse v.*

*Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989)); *see* 42 U.S.C. § 2000e–2(m) ("[A]n unlawful employment practice is established when the [plaintiff] demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."). "The types of indirect evidence that suffice in a pretext case to make out a prima facie case—or even to carry the ultimate burden of persuasion—do 'not suffice, even if credited, to [meet this standard].' " *Raskin v. Wyatt Co.,* 125 F.3d 55, 60 (2d Cir.1997) (quoting *Ostrowski v. Atlantic Mutual Ins. Companies,* 968 F.2d 171, 180 (2d Cir.1992)). Instead, "direct" evidence must be shown; evidence that is considered "direct" for this purpose includes, inter alia, policy documents and evidence of behavior by decision makers that reflects the alleged discriminatory attitude. *See id.* "In short . . . the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support [her] allegations of discriminatory treatment." *Id.* Once the plaintiff has sufficient direct evidence of discriminatory animus, the employer bears the burden of proving that it would have made the same decision even had there been no such animus. *See de la Cruz v. New York City Human Resources Admin. Dep't of Soc. Services,* 82 F.3d 16, 23 (2d Cir.1996).

Having outlined these parallel lines of inquiry, I note that in this case (as in so many others), the various burden shifts described shed little, if any, light on the question to be decided. As noted earlier, Columbia appears not to dispute the fact that Jalal has established a prima facie case of discrimination.[12]

---

**11.** As Judge Charles L. Brieant noted in *Bickerstaff,* 992 F.Supp. at 372–73, the Second Circuit appears to have been less than entirely consistent in describing the elements of a Title VII prima facie case. In *Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 311–12 (2d Cir.1997), for example, the court indicated that the fourth prong of the prima facie case requires a plaintiff to show that the defendant's decision "occurred in circumstances giving rise to an inference of discrimination on the basis of [her] membership in [a protected] class." Several interpretations of this holding are possible in light of *Fisher.* First, the court may have intended to return to the prima facie standard elucidated for tenure denial cases in *Zahorik v. Cornell Univ.,* 729 F.2d 85 (2d Cir.1984). *See id.* at 92 (fourth element

requires showing that plaintiff was "not granted tenure in circumstances permitting an inference of discrimination."). Second, it may have intended to distinguish academic failure-to-hire cases like *Stern* from denial of tenure cases, despite the obvious parallels. Finally, it may be that there is no material difference between the elements described in *Fisher* and *Stern.* While I am willing to contribute to the large body of metaphysical philosophy that has so distinguished this area of the law, I refrain from doing so as Columbia has tacitly conceded that Jalal's prima facie burden has been met.

**12.** *See supra,* note 11. Columbia's restraint in this regard is not without reason. *See Fisher,* 114 F.3d at 1337 ("In our diverse workplace,

Moreover, Jalal has proffered both "direct" and "indirect" evidence that bias motivated the decision to deny her tenure. For its part, Columbia has produced evidence to suggest that Jalal was denied tenure for legitimate, nondiscriminatory reasons. Much of the same evidence, Columbia contends, goes to prove that even if bias played a role in the decision, the result would have been the same without it. When all the burdens finish shifting, then, it becomes apparent that the sole issue presented by this motion is the "ultimate issue" in every Title VII case: Whether the plaintiff has presented evidence from which a rational finder of fact could conclude that the defendant discriminated against her illegally.[13] *Stratton,* 132 F.3d at 878 (quoting *Fields v. New York State Office of Mental Retardation & Developmental Disabilities,* 115 F.3d 116, 119 (2d Cir.1997)). Rather than dance mechanistically through the *McDonnell Douglas* and *Price Waterhouse* "minuets," therefore, I will proceed directly to the ultimate issue, *Fisher,* 114 F.3d at 1343, examining Jalal's items of evidence *seriatim.*

### 1. A Note on the Interpretation of Ambiguous Comments

Much of the evidence of discrimination Jalal proffers is in the form of comments made by people having some connection with her tenure review process. Before beginning analysis of these sometimes cryptic statements in earnest, a word on the difficulty of the task is warranted.

■ Identifying the inferences that can rationally be drawn from ambiguous comments often presents a court with close questions. Given the nature and importance of academic dialogue, and the often subtle means by which unlawful bias manifests itself, the job is especially difficult in Title VII tenure cases. On the one hand, courts have long recognized the importance of unfettered academic discourse in preserving First Amendment values. *See, e.g., Keyishian v. Board of Regents of the Univ. of New York,* 385 U.S. 589, 603, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment...."); *Sweezy v. State of New Hampshire,* 354 U.S. 234, 250, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) ("The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth."); *Adler v. Board of Education of the City of New York,* 342 U.S. 485, 511, 72 S.Ct. 380, 96 L.Ed. 517 (1952) (Douglas, J., dissenting) (academic freedom is crucial to "the pursuit of truth which the First Amendment was designed to protect"); *Lieberman v. Gant,* 630 F.2d 60, 67 (2d Cir. 1980) ("[A]cademic freedom ... cannot be disregarded in determining the proper role of courts called upon to try allegations of discrimination by universities ...").

■ If trial courts allow Title VII plaintiffs to reach a jury on the strength of comments by academic decisionmakers that are ambiguous, but support no rational inference of bias, this principle may be compromised: The risk of eventually being called into court to explain some abstruse critique of a colleague's work before a jury could chill the discussion of difficult but important issues. Of necessity, academics sometimes resort to obscure references and impressionistic language to communicate complex ideas. Moreover, some of these ideas may relate to issues

---

virtually any [employment] decision ... will support a slew of prima facie cases of discrimination.").

**13.** As noted earlier, plaintiff has proffered a tremendous volume of "evidence," much of which fails to assist the court in the resolution of this question. *See supra* note 1. For instance, she insinuates that prejudice can be adduced from the fact that Cole's children attend the same school as the children of Desai and Bhagwati; that one TRAC member "had reason to be bi-

ased" against the plaintiff because he is a professor in a department which stood to benefit from a grant that the plaintiff opposed; and that Milner criticized Jalal's historical research for failing to take into account European sources. *See* Pl's 56.1 at ¶¶ 6, 6(a), and 10(b), respectively. I do not address each and every one of these allegations, as they cannot support, either individually or collectively, a rational inference of discrimination.

of race, religion, gender, etc. that—while they are impermissible criteria for making employment decisions—are nevertheless a legitimate field of academic inquiry. Courts must therefore be wary of finding that merely because a comment by a decisionmaker is ambiguous and addresses a colleague's membership in a class protected by Title VII, a rational inference of discriminatory animus can therefore be drawn. *See Brown v. Trustees of Boston Univ.*, 891 F.2d 337, 350–51 (1st Cir.1989) (trial court erred in admitting evidence of university dean's public speech on working mothers and neglected children in sex discrimination suit: "We fear ... the chilling effect that admission of such remarks could have on academic freedom. Use of such evidence in a court of law could cause a university president, dean or teacher to avoid topics of this kind altogether for fear that one or two sentences might later be used as evidence of alleged discriminatory remarks.").

■ It must also be noted, however, that important as it is, academic freedom does not "embrace [ ] the freedom to discriminate." *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1154 (2d Cir.1978). While judges are frequently admonished not to second-guess the merits of a university's collective academic judgment as to a tenure candidate's qualifications, *see, e.g., University of Pa. v. EEOC*, 493 U.S. 182, 199, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) ("This Court ... has cautioned that 'judges asked to review the substance of a genuinely academic decision should show great respect for the faculty's professional judgment.'") (quoting *Regents of University of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985)); *Faro v. New York Univ.*, 502 F.2d 1229, 1231 (2d Cir.1974) ("Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision."), the Second Circuit has also pointed out that "Congress has evidenced particular concern for the problem of employment bias in an academic setting." *Powell*, 580 F.2d at 1154. In fact, the *Powell* court went so far as to opine that "far from taking an anti-interventionist position with respect to the academy, the Congress has instructed us to be particularly sensitive to evidence of academic bias." *Id.* It must also be recognized that this bias will rarely manifest itself in obvious ways: As one court has noted, "[d]efendants of even minimal sophistication will neither admit discriminatory animus nor leave a paper trail demonstrating it." *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir.1987); *see Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1082 (3rd Cir.1996) ("[W]hile discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind."). Thus, courts must remain alert to the fact that subtle, yet rational inferences of bias may sometimes be drawn from ambiguous comments, and that this is at least as true in academia as it is in any other field.

■ The narrow path between these conflicting policies requires courts to draw a careful distinction between evidence that allows a rational inference of discriminatory intent and evidence that gives rise to mere "speculation and conjecture" on the subject. *Western World Ins. Co.*, 922 F.2d at 121. As courts frequently explain to jurors, "[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact [that is known to exist.]" 1 Leonard B. Sand, et al., Modern Federal Jury Instructions ¶ 6.01 (1997); *See also* Black's Law Dictionary 700 (5th ed. 1979) ("An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action."). Whether a decisionmaker's comment supports an inference of bias is therefore not a matter of gut impression, but of logic.

This principle is easier to state, of course, than it is to apply. Because of the inevitably fact-specific focus of prior decisions, precedent can generally provide only rough guidance as to analysis of particular statements. Nevertheless, some useful general principles can be extracted from case law on the subject.

■ Most importantly, it appears that a statement can support a rational inference of

bias in either of two ways. First, it can show that the speaker is preoccupied with a Title VII classification in a setting where a focus on other issues would ordinarily be expected. In *Brown,* 891 F.2d 337, for instance, the court considered the probative value of a university president's statements, "I don't see what a good woman in your department is worrying about. The place is a damn matriarchy," and "your husband is a parachute, so why are you worried?" made during a discussion of a female professor's tenure candidacy. *Id.* at 349. While finding that it would take a "tremendous leap" to conclude from these comments that the plaintiff was denied tenure because of her gender, the court nevertheless held these comments to be admissible: They arguably demonstrated the president's excessive interest in the candidate's gender and a correspondingly lesser interest in her scholarly credentials. *Id.* at 349–50; *see also Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 675 (1st Cir.1996) (supervisor's repeated comment that plaintiff was the only Puerto Rican running a Cuban company supported rational inference that supervisor discriminated against plaintiff because of his national origin).

Second, a statement can reveal a speaker's prejudice if it (1) makes a reference to a Title VII-protected class *and* (2) provides some indication that membership in such a class is disapproved of. Statements that fail to satisfy the first criterion—i.e. ones that are merely rude or derogatory—are clearly insufficient to show discrimination based on an impermissible categorization. *See e.g., Gartman v. Gencorp Inc.,* 120 F.3d 127, 130 (8th Cir.1997) (statements to female employee that she did not know "how to belly up to the bar" and that she should not show her ignorance by referring to an engine when she meant a block were not evidence of sex discrimination); *Hill v. St. Louis Univ.,* 123 F.3d 1114, 1119 (8th Cir.1997) (supervisor's statement that he wanted to hire someone new to bring "fresh blood" to the position did not support inference of either age or gender bias). Statements that merely acknowledge a person's membership in a Title VII-protected class similarly fail to demonstrate bias. *See, e.g., Fisher v. Vassar College,* 70 F.3d 1420, 1440–41 (2d Cir.1995), *aff'd en banc,* 114 F.3d 1332 (2d Cir.1997) (statement in departmental report that tenure candidate took nine years off to raise a family did not, without more, support an inference of discrimination against candidate on the basis of her marital status); *see also Ryan v. Grae & Rybicki, P.C.,* 135 F.3d 867, 869 (2d Cir.1998) (statement to plaintiff that "this job is too stressful for you because you have colitis" did not support inference that employer believed plaintiff's illness rendered her incapable of performing adequately in other jobs). As noted above, of course, disapproval—and therefore prejudice—may be expressed in highly indirect ways. *See e.g., Price Waterhouse,* 490 U.S. at 256, 109 S.Ct. 1775 (description of aggressive female employee as requiring "a course at charm school" supported inference that speaker entertained stereotypical views of a woman's proper behavior, and thus that he discriminated against her). However, this fact does not allow courts to go beyond the language of the statement at·issue to find inferences of bias where none exist. *See Fisher,* 70 F.3d at 1441 (district court erred by giving innocent statement a "jaundiced reading" that "place[d] a strain on the text" to allow an inference of bias).

### 2. Desai

### B. Desai's Conversation with Rai

With these considerations in mind, I turn to Desai's comments. The first of these—made in her conversation with graduate student Rai—are the most problematic. Viewed separately, the statements "how do you feel about working with a Pakistani?" and "I have heard that [Jalal] holds and expresses distinctly anti-Indian views" plainly fail to show discriminatory. animus. The former reveals an awareness of Jalal's national origin and of the well-known fact that Indian/Pakistani relationships are sometimes fraught with tension, but it does not cast Pakistanis in a negative light. The latter merely reports a hearsay analysis of Jalal's political and/or historical views. Given that Desai is of Indian origin, a jury could infer that she disapproves of those who express "anti-Indian" views. As discussed earlier, however, disapproval must be based on an

impermissible criterion. *See Gartman*, 120 F.3d at 130; *Hill*, 123 F.3d at 1119. For this comment to reflect discriminatory animus, a factfinder would have to infer that Desai's belief regarding Jalal's alleged anti-Indian views arose not from what she had been told, but from her assumption that Pakistanis and/or Muslims in general are anti-Indian. The second comment reveals no basis for such an inference.[14]

When the comments are read together, it is apparent that the second was made by way of explanation of the first: When Rai denies having any problem with Jalal, Desai says, in effect, "I ask because I have heard that Jalal expresses anti-Indian views." One could infer from this that Desai assumed Rai, as an Indian, would object to Jalal's views and that ethnic tension would result. Again, however, the comment does not imply that Desai's belief as to those views derived from the fact of Jalal's nationality. Jalal would have a jury conclude that what Desai meant to say was, "Pakistanis hold anti-Indian views." This reading, however, cannot be reconciled with the words Desai is alleged to have used: "I have heard *she* holds ... anti-Indian views." [15] Thus, no rational juror could conclude that Desai harbored discriminatory animus on the basis of these comments.

### C. Desai's Description of Being the Victim of Sex Discrimination

■ In Desai's second statement, made two years after the Jalal ad hoc meeting, she mentioned that she had been unfairly passed over for promotion in favor of a Muslim man. Jalal suggests that the fact that Desai mentioned the man's religion, when the ostensible point of the story was to describe how she was the victim of sex discrimination, supports an inference of anti-Muslim bias. In making this argument, Jalal apparently relies on the "preoccupation" theory established in *Brown* and described briefly above.

Unlike in *Brown*, however, the comment here was an isolated one. *See* 891 F.2d at 349–50. Moreover, it was not made in a decisionmaking context but in deposition. Given that Desai stood accused of harboring anti-Islamic bias, it is hardly surprising that Hindu/Muslim tension was on her mind when she recounted the story. This statement fails to support even a reasonable suspicion, let alone a rational inference, of discriminatory animus.

### D. Desai's Comments at the Ad Hoc Committee Meeting

■ Finally, Jalal argues that a rational inference of bias can be drawn from the issues Desai raised at the outset of the ad hoc committee's deliberations. The question of whether Jalal's scholarship was "narrowly confined to Pakistan," she asserts, demonstrates Desai's belief that Pakistanis cannot teach Indian history. Jalal also points to the fact that Desai brought up the issue of her prospective leadership of the Southern Asian Institute. She suggests that this reveals bias in light of Desai's admission at deposition that the subject was irrelevant to a tenure decision.

These arguments are meritless. As to the first issue, the inferential leap Jalal suggests can be made is one of blind faith, not logic. Starting from the implicit statement "Jalal's scholarship is focused too narrowly on Pakistan," one simply cannot reach the conclusion that "Pakistanis cannot teach Indian history" by a process of reason.

As to the second, Jalal takes Desai's deposition testimony out of context. Desai testified that:

> [W]hether a person makes a good director of an institute is not [a] criterion for a person's tenure appointment. But ... it is relevant to look for the brownie point; that is, if the appointment comes through strict-

---

14. The comment, *"I have heard* that [Jalal] holds ... anti-Indian views"* suggests that Desai's belief was not the product of a discriminatory cultural assumption, but simply the result of having been so informed.

15. The fact that Desai credited her unnamed source's report as to Jalal's views rather than Rai's representations does not make these com-

ments any more probative. A jury could only speculate as to why this was: Desai may have received her information from a reliable source, she may have thought Rai naive, or she may have been stubborn. Absent extreme circumstances, adherence to one's non-discriminatory views cannot be transformed into evidence of bias.

ly on the scholarly merits of a candidate's work and the signal which that work conveys with regard to the future potential of that work, that person may become a director of an institute and you get a brownie point that way.

Desai Dep. at 410–411. In context, then, what Desai said was that while institute-leadership potential is much less significant than scholarship, a favorable assessment of a candidate's leadership skills may marginally improve that person's chances. Even at the summary judgment stage, comments must be considered in the context in which they were made. See Paulsboe v. Farnam Companies, Inc., 120 F.3d 271, 1997 WL 431414, at *3 (10th Cir.1997) (statement by decisionmaker that female sex-discrimination plaintiff should act like "one of the guys" did not support a rational inference of bias when, in context, comment clearly referred to plaintiff's marketing style rather than her gender); Neuren v. Adduci, Mastriani, Meeks & Schill, 43 F.3d 1507, 1513 (D.C.Cir.1995) (use of the word "bitch" to describe plaintiff in work evaluation was not probative of sex discrimination when it was clearly used in the context of a legitimate, work-related concern); Zahorik, 729 F.2d at 94 (statement that plaintiff was too "feminine" was not probative of sex discrimination when, in context, it clearly referred to gender-neutral job-performance issue). No rational inference of bias, therefore, could be drawn from either of the questions asked by Desai.[16]

## E. Causation

■ Even if Desai was biased, there remains the issue of whether this bias had any influence on the outcome of the decision to deny Jalal tenure. Jalal concedes that no discussion of her national origin or religion took place at the ad hoc committee meeting. Her theory therefore requires an inference that Desai was able to affect the outcome of the ad hoc committee vote by means of negative, but facially non-discriminatory comments. It is certainly true that a Title VII plaintiff need not show that every one—or even a majority—of a group of decisionmakers was biased in order to prove that a decision was infected by discrimination. See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 256, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (group decision was biased when made in reliance on biased comments of some of defendant firm's partners); Rosen v. Thornburgh, 928 F.2d 528, 534 (2d Cir.1991) (finder of fact could find that decision was the product of religious bias, even if ultimate decisionmaker was unaware of plaintiff's religion, when biased supervisors played a role in the decision). In the majority of the cases that address this issue, bias can be attributed to the group as a whole via its members' failure to object to a colleague's facially discriminatory statements. See, e.g., Price Waterhouse, 490 U.S. at 256, 109 S.Ct. 1775; Barbano v. Madison County, 922 F.2d 139, 142 (2d Cir.1990) (group decision could be found biased when one group member asked openly discriminatory questions at interview and other members did not object).[17] Neverthe-

16. Jalal also contends that a fact finder could infer that Desai was biased from the fact that she testified erroneously at deposition that Jalal was applying for a position as "professor" rather than "associate professor," and that the former requires a candidate to meet a higher standard than the latter. See Desai Dep. at 264. Desai further testified that to the best of her recollection, Mark von Hagen, a non-Muslim, non-Pakistani historian who previously received tenure had been applying for an associate professor position. See id. at 265. In fact, Jalal would have remained an associate professor had she received tenure. See Harris Dep. at 34. Desai did not testify that she held Jalal to a higher standard than von Hagen; later in her testimony, she said that the different standards she referred to did not apply to candidates for tenure, but only to those applying for non-tenured teaching positions. See id. at 289.

No rational juror could find that this evidence supports an inference of discriminatory intent. Certainly, differential treatment can, in some instances, show discrimination. Here, however, Desai did not testify that different standards had in fact been applied. If a jury inferred that they were, it could only do so on the basis of Desai's statement that she thought von Hagen and Jalal were applying for different positions. As to Desai's intent, this inference would only allow the jury to conclude that Desai mistakenly applied different standards, not that she intentionally did so.

17. The Barbano court also noted, however, that "discrimination by one individual does not necessarily imply that a collective decision-making body of which the individual is a member also discriminated." Id. at 142.

less, I accept the proposition that, under certain circumstances, facially neutral comments made by a biased committee member may raise a rational inference that bias impermissibly affected the committee's decision. *See Lam v. University of Hawaii,* 40 F.3d 1551, 1560 (9th Cir.1994) (discrimination in committee decision could be inferred from evidence that biased member disparaged plaintiff's abilities during a committee meeting). In the typical case, in fact, a jury could probably infer that a committee member had a degree of influence on the committee's decisions from the mere fact of her participation in deliberations.

In the somewhat unusual circumstances of this case, however, no such inference is possible. It is undisputed that before Jalal's ad hoc committee meeting, each member of the committee had grave reservations about the quality of her work. Indeed, Combs–Schilling had decided to vote against tenure, and Milner was "leaning" that way. It is equally undisputed that these conclusions were reached without any substantive input from Desai. Finally, it is undisputed that Desai did not contribute at all in the first portion of the meeting—the testimony of Jalal's witnesses—and that Curtis, White and Milner peppered one of those witnesses with hostile questions. Given these facts, a rational finder of fact could not conclude that Desai's alleged bias materially influenced the committee's deliberations.

**3. White**

■ Jalal's assertion that White was biased against her relies on an analogy he drew at the ad hoc committee meeting between her work and that of a "White" Russian studying Soviet history or a Vermont

historian decrying the outcome of the Civil War. Jalal contends that this comment allows an inference that in White's view, Pakistanis should not teach Indian history. I disagree. As discussed earlier, the fact that a comment is ambiguous and addresses the plaintiff's membership in a Title VII-protected group does not, in itself, raise a triable issue of discriminatory intent.[18] The critical element missing here is an indication that White felt Jalal's status as a Pakistani reflected badly on her in any way. If anything, it appears to show her in a *favorable* light, as someone whose scholarship is not limited by unquestioning acceptance of patriotic historical myths. A juror would not, of course, be required to accept this positive interpretation. However, there is no reasoned basis for preferring a negative one.

**4. Bhagwati**

■ On the subject of Bhagwati's purported bias, Jalal points to his alleged comment that "you can't expect a Pakistani to teach the history of India." Here, Jalal is on much firmer ground. This statement could clearly be interpreted to mean that, in Bhagwati's eyes, a professor's Pakistani origin reflects negatively on her ability to teach Indian history.[19]

The problem with this evidence, from Jalal's perspective, is that Bhagwati's connection to the tenure decision is highly attenuated. It is true that he participated in TRAC meetings that had input into the membership of Jalal's ad hoc committee. However, as I have just discussed, there is no evidence from which a rational fact finder could conclude that any member of that committee was biased.[20] Moreover, there is uncontradicted testimony that Bhagwati did not con-

---

**18.** White's comment, in fact, is a perfect illustration of why this is so. Discussion of how the work of a scholar or artist is influenced by his or her background is not only permitted by Title VII, it is an important part of the academic freedom protected by the First Amendment. I note in this regard that much modern cultural and literary criticism is devoted largely to just such discussions. Those aspects of a person's background that implicate Title VII, of course, cannot be used as a basis for employment decisions. However, absent some indication that they were so used, courts must be careful to

avoid chilling inquiry into this legitimate area of scholarship.

**19.** Because a rational juror could conclude from this evidence that Bhagwati was biased, I need not address the probative value of his comment, "I hear your professor is being denied tenure."

**20.** As discussed in Part III.A.2.D., even if there were evidence of bias on the part of Desai, there is no evidence supporting an inference that she influenced the outcome of the ad hoc committee's vote.

tribute to the discussion when TRAC considered recommending Desai for the committee. As Jalal points out, Bhagwati may have opposed TRAC's recommendation of Bilgrami, a Muslim; however, this recommendation was nevertheless made. While Bhagwati may indeed have been biased, there is no evidence that his views were reflected in the composition of Jalal's ad hoc committee.

Jalal also suggests, however, that Bhagwati's alleged bias can be attributed to Desai because of their marriage. In support of this theory, she cites *Mulero–Rodriguez*, 98 F.3d at 675–76, in which discriminatory statements by a non-decisionmaking employee were held to be attributable to the employer, in light of testimony that the employer relied on the employee's representations as to other matters. There is no similar evidence here: Jalal would ask a jury to infer that Desai was biased merely because she is married to Bhagwati. At common law, this theory may have been tenable, as married women were not considered to have legal identities separate from their husbands.[21] This, however, is no longer the case: For some time, courts have recognized that women, including married women, are capable of developing their own opinions.[22] A conclusion that Desai shared Bhagwati's bias, therefore, would be a product not of inference, but of speculation.

## 5. Cole

Jalal contends that Cole's alleged bias can be inferred from the fact that he was warned to keep Desai off her ad hoc committee and failed to do so. It is true that acquiescence with a decision that is known to have been the product of discrimination can itself show a discriminatory intent. *See Price Waterhouse*, 490 U.S. at 256, 109 S.Ct. 1775 (decisionmakers' reliance on discriminatory statements was evidence that decision was discriminatory); *Barbano*, 922 F.2d at 143 (decision could be found discriminatory when decisionmaking board relied on report written by committee known to have been biased). There is no evidence here, however, that Cole knew Desai to harbor bias. Harris allegedly warned him that she should not be a member of the committee,[23] but neither he nor any other witness suggests that this warning was accompanied by facts that could corroborate his implicit accusation of prejudice.[24] This situation is thus clearly distinguishable from *Price Waterhouse* and *Barbano*: in those cases, the ultimate decisionmaker had been presented with specific and credible evidence that the reports on which they relied were contaminated by bias. *See* 490 U.S. at 256, 109 S.Ct. 1775; 922 F.2d at 144.[25] Perhaps Cole was negligent in not conducting some sort of in-

**21.** "By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage ... [Y]et there are some instances in which she is separately considered; as inferior to him, and acting by his compulsion...." 1 William Blackstone, Commentaries on the Laws of England 441–44 (Tucker, ed. 1803).

**22.** In addition, I take judicial notice of the existence of occasional disagreement between husbands and wives.

**23.** I note that the statements of Rittenberg, Gordon and Jalal on this subject, while hearsay, appear to fall within the exception provided by Fed.R.Evid. 801(d)(2)(D), in that they all report comments allegedly made by Harris, the then-Chair of the History Department.

The Bose affidavit, on the other hand, does not: Bilgrami's alleged comment to Bose does not "concern[ ] a matter within the scope of [his] employment" as a Columbia philosophy professor. However, I need not reach these issues, as

this testimony would not raise a genuine issue of material fact even if admitted at trial and credited by the jury.

**24.** Harris testified that he told Cole merely to be wary of "ethnic sensitivities" with regard to Jalal's ad hoc. other witnesses suggest that this warning was somewhat more specific in that Desai's name was mentioned. *See, e.g.*, Rittenberg Dep. at 179–81. Jalal goes the furthest in this regard; she avers that Harris told her he "had told [Cole] that individuals like Desai had expressed bias against [Jalal] because of [her] religion and nationality." Jalal Aff. at ¶ 28. This version of events is the most favorable one from Jalal's point of view. For the purposes of resolving this motion, therefore, I will assume that a jury would accept it.

**25.** In *Price Waterhouse*, in fact, the reports relied on were facially discriminatory, a circumstance which removed all doubt as to whether the decision was made with knowledge of the prejudice. *See* 490 U.S. at 256, 109 S.Ct. 1775.

vestigation when he was confronted with Harris' objection, innuendo though it was. Title VII, however, provides no remedy for negligent discrimination (if such a thing is possible): Only action taken with an *intent* to discriminate is prohibited. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089.

■ Furthermore, even if there were evidence of Cole's alleged bias, Jalal's claim would still face the problem of causation. While Cole was the nominal decisionmaker, it is undisputed that a unanimous ad hoc committee vote would not be overturned. It is similarly admitted that Cole said nothing substantive to any ad hoc committee member either before or during the meeting. No rational juror, therefore, could conclude that he had a direct influence on the outcome of the tenure decision. Nor could a rational juror conclude that the ad hoc committee he chose was biased. Thus, no inference of causation—either direct or indirect—is possible.

## 6. Stricter Standards

■ Finally, Jalal contends that bias can be inferred from the fact that her ad hoc committee imposed a stricter standard than is applied to non-Muslim, non-Pakistani tenure candidates. A demonstration of disparate treatment is, of course, a viable means by which bias can be shown. However, because of courts' proper reluctance to act as "Super–Tenure Review Committees," *Lieberman*, 630 F.2d 60 at 67–68 (quoting *Keddie v. Pennsylvania*, 412 F.Supp. 1264, 1270 (M.D.Pa.1976)), evidence of comparative academic credentials is only admissible when the plaintiff's qualifications are "clearly and demonstrably superior to those of the successful [candidates]." *Lieberman*, 630 F.2d at 68; *see Zahorik*, 729 F.2d at 94 (female professor's assertion that she was more qual-

ified than successful male tenure candidates was not probative of sex discrimination when "the record at best indicate[d] a difference of opinion in evaluation of scholarly merit").

While Jalal's credentials are indeed impressive, they are not "clearly and demonstrably superior" to those of the successful candidates she names. The ad hoc files of professors Frances Pritchett, Richard Billows and von Hagen are also replete with evidence of degrees from prestigious schools, well-received publications and laudatory letters from eminent scholars. To admit these files as evidence from which an inference of discrimination could be drawn would be to invite the jury to reassess the scholarly merits of the committee's decision, an invitation Title VII does not permit me to make. *see, e.g., University of Pennsylvania*, 493 U.S. at 199, 110 S.Ct. 577; *Faro*, 502 F.2d at 1231.[26]

## F. Retaliation

■ The second arrow in Jalal's quiver is a retaliation claim. She asserts that her allegations of prejudice led Columbia to take retaliatory action against her at two stages in her tenure review process. First, she claims that Cole named Desai chair of her ad hoc committee in retaliation for her complaints to Harris regarding Desai's alleged bias. Second, she says that Cole's refusal to convene a second ad hoc was motivated by the allegations of bias she made after the first. In pertinent part, 42 U.S.C. § 2000e–3(a) provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of [its] employees ... because [the employee] has opposed any practice [made unlawful by Title VII]." To establish a prima facie case of retaliation under Title VII, a plaintiff must show 1) that she engaged in protected activity by protesting a practice she reasonably believed to be unlawful under Title VII, 2) that the employ-

---

**26.** I note that even if this evidence were admissible, its probative value would be minimal: The Jalal, Pritchett, Billows and von Hagen ad hoc committees had virtually no common members, a fact which severely weakens any inference of intentional disparate treatment. *See Zahorik*, 729 F.2d at 93 ("Because of the decentralized

nature of the [tenure] decision-making process, comparisons which might tend to show unlawful discrimination are hard to come by. A denial of tenure by an English department simply cannot be compared with a grant of tenure in the physics or history departments.").

er was aware of that activity, 3) that she suffered an adverse employment action, and 4) that there was a causal connection between the protected activity and the adverse action. *See Galdieri–Ambrosini v. National Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir.1998) (citing *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir.1996)).[27] The causal connection element of this test may be met by a proffer of either direct or circumstantial evidence. *See Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990). The *McDonnell–Douglas* rules described in section III.A. apply to retaliation claims as well. *See Reed*, 95 F.3d at 1178.

The deficiencies in this claim are legion. As to Cole's decision to make Desai the chair of the ad hoc committee, Jalal has not proffered any evidence to suggest that Cole knew she, rather than Harris, was the source of the accusations against Desai. She has therefore failed to satisfy the second element of a prima facie retaliation claim: If Cole was unaware of Jalal's complaint, his decisions could not have been motivated by the fact that she made them. Furthermore, as I have discussed, there is no evidence from which a rational juror could conclude that Desai was biased against Pakistanis or Muslims, nor is there evidence that Cole believed otherwise. Appointing her to Jalal's ad hoc committee, therefore, could not have been an "adverse employment action" for purposes of satisfying the third element of her prima facie case. *Galdieri–Ambrosini*, at 292.

As to Columbia's refusal to convene a second ad hoc, this is merely an attempt to bootstrap a discrimination claim into a retaliation claim. Jalal's argument would perhaps be tenable if there were some evidence sug-

gesting that Columbia ad hoc committees are reconvened as a routine matter or that some basis other than alleged ethnic prejudice had been advanced as a reason for a second ad hoc committee in her case. In such a case, Jalal could claim that, but for her allegations of discrimination, the decision to deny her tenure would have been reexamined. However, there is no such evidence here. She is therefore left with the bald assertion that Columbia denied her a second ad hoc committee because she asked for one. In addition to being highly counter-intuitive, this argument is entirely unsupported by the evidence.

### IV. Conclusion

Jalal has not proffered evidence from which a rational finder of fact could conclude that Columbia's decision to deny her tenure, or its refusal to reconsider that decision, was influenced by unlawful discrimination. Because there are no genuine issues of material fact in dispute, Columbia's summary judgment motion is granted and the complaint is dismissed.

SO ORDERED.

---

**27.** Again, for the purposes of this motion, Jalal's state law retaliation claims are indistinguishable from her corresponding Title VII claim. *See Reed*, 95 F.3d at 1177 ("We consider Reed's state law claims in tandem with her Title VII claims because New York courts rely on federal law when determining claims under the New York Human Rights Law."); see also supra note 10.